Ira D. Kharasch (CA Bar No. 109084)
John W. Lucas (CA Bar No. 271038)
Victoria A. Newmark (CA Bar No. 183581)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90064
Telephone:  (310) 277-6910
Facsimile:   (310) 201-0760
E-mail:   ikharasch@pszjlaw.com
              jlucas@pszjlaw.com
              vnewmark@pszjlaw.com

Proposed Attorneys for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>HYTERA COMMUNICATIONS AMERICA (WEST), INC., *et al.*<br><br>Debtors and Debtors-in Possession.<br><br>Affects:<br><br>☒  All Debtors<br><br>☐  HYTERA COMMUNICATIONS AMERICA (WEST), INC., ONLY<br><br>☐  HYTERA AMERICA INCORPORATED, ONLY<br><br>☐  HYT NORTH AMERICA, INC.,  ONLY | Case No.  8:20-bk-11507-ES<br><br>Chapter 11<br><br>Jointly Administered With Case Nos.: 8:20-bk-11508-ES and 8:20-bk-11509-ES<br><br>**DECLARATION OF NI HUANG, PRESIDENT AND CHIEF FINANCIAL OFFICER OF HYTERA COMMUNICATIONS AMERICA (WEST), INC. AND HYTERA AMERICA INCORPORATED, IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS**<br><br>Date:      June 2, 2020<br>Time:     2:00 p.m.<br>Place:    Courtroom 5A<br>              411 West Fourth Street<br>              Santa Ana, CA 92701<br><br>Judge:    The Honorable Erithe A. Smith |

I, Ni Huang, declare:

1.      I am the President and Chief Financial Officer of debtors and debtors in possession Hytera Communications America (West), Inc. ("Hytera West") and Hytera America, Inc. ("Hytera

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

East"). Hytera West, Hytera East and their debtor affiliate HYT North America, Inc. ("HYT North America") are referred to herein collectively as "Hytera America" or the "Debtors".

2. I am generally familiar with the current day-to-day operations, business, and financial affairs of the Debtors, as well as their books and records. Except as otherwise indicated, all facts set forth in this declaration are based on (i) my personal knowledge of the Debtors' employees, operations, and finances; (ii) information learned from my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team and its advisors; or (iv) or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial condition. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors. If called upon to, I could and would testify competently to the facts set forth herein.

3. On May 26, 2020 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Central District of California (Santa Ana Division) (the "Bankruptcy Court"). The Debtors have filed numerous motions and pleadings which seek various types of "first day" relief which will enable the company to meet necessary obligations, fulfill its obligations as debtors in possession and avoid a disruption of its business operations (collectively, the "First Day Motions"). I am familiar with each First Day Motion and believe that the relief requested in each is necessary to enable the Debtors to operate in chapter 11 with minimal disruption and is critical to enable the Debtors to retain value. Accordingly, granting each First Day Motion is in the best interest of the Debtors' estates and their creditors. The facts set forth in each First Day Motion are incorporated by this reference.

4. This declaration is organized into four sections: (1) section one provides background information about the Debtors; (2) section two includes detailed information about the Debtors' assets and debts; (3) section three describes the events leading to the filing of this chapter 11 case and (4) section four and **Exhibit A** summarize the relief requested and the legal and factual bases supporting each First Day Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

2

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**SECTION I**

**BACKGROUND AND OPERATIONS**

A. <u>General</u>

5.      The Debtors are one of the top providers of mobile two-way radios in the United States.  The Debtors supply its products to over 400 independent dealers nationwide, who in turn offer and service professional communications systems that integrate the Debtors' products.  The Debtors' radios are used for security and other communications applications in various industries in the public and private sectors of local communities, including hospitals, local law enforcement, school districts, universities, and financial companies.

6.      Debtor Hytera East's operations are based in Miami, Florida. Originally known as Marketronics Corporation ("<u>Marketronics</u>"), in 2007, Debtor HYT North America acquired a majority share of Marketronics and changed the name to HYT America, Inc.  HYT North America subsequently acquired the remaining share of Hytera East and, in 2011, Hytera East's name became "Hytera America, Inc."  Debtor Hytera West was established in 2016 in Los Angeles, California. Hytera East services the Debtors' dealer network on the East Coast and several contiguous states. Hytera West's territory includes the West Coast, Northwest, Mid-West, as well as some Southern states.  HYT North America is nothing more than a holding company of the two operating Debtors.

7.      The Debtors have 39 full-time employees, 33 of whom are salaried and 6 of whom are hourly.  Hytera East has 20 full-time employees, and Hytera West has 19 full-time employees. In each case, employees' functions include sales, sales engineer, technical support, finance, logistics, human resources, legal, and marketing.  Among Hytera East's employees, 17 are salaried, and 3 are paid based on actual hours worked. Among Hytera West's employees, 16 are salaried, and 3 are paid based on actual hours worked.

8.      For the year ended December 31, 2019, Hytera East and Hytera West had revenues of $27.2 million and $15.7 million, respectively, and net operating income of approximately $1.3 million (Hytera East) and $(1.4 million) (Hytera West).  For the first quarter of 2020, the Debtors estimate that Hytera East had revenues of approximately $3.4 million and net operating income of

3

$(958,000), and that Hytera West had revenues of approximately $2.0 million and net operating income of $(600,000).

9.    The Debtors are both 100% wholly owned subsidiaries of holding company Debtor HYT North America which is, in turn, wholly owned by non-debtor Hytera Communications Corporation, Ltd. (002583.SZ) ("Hytera China"), a public company listed on the Shenzhen Stock Exchange.  Established in 1993 in Shenzhen, China, Hytera China and its affiliates constitute the world's second largest and fastest growing mobile radio provider, and the world's top trunked digital mobile radio ("DMR III") communications solution provider.  Attached hereto as **Exhibit B** is an illustrative corporate organization chart.

### B.  Hytera America's Operations

#### 1.    Radio Import, Marketing, and Sales

10.    The Debtors' operations consist of the import, marketing, and sale of two-way radios, which are manufactured by affiliates under the Hytera China umbrella.  The Debtors' products cover a range of technologies, including:[1]

> o  *Digital Mobile Radio ("DMR") Radios and Repeaters*. DMR is an "open" digital radio standard, which has been developed to enable products to be combined with different brands of systems.  The DMR technology combines voice, data, features and applications.  The Debtors' DMR radios work with any other compliant system. The Debtors' offer models specifically designed for indoor and outdoor uses.

> o  *LTE Multi-Mode Handsets*.  The Debtors' suite of LTE handsets combines narrowband voice and broadband data transmission capabilities into a single radio unit akin to a smartphone. The Debtors' products are available as either a DMR or TETRA variant.  Voice may be used on public or private networks.

[1] Additional information about the Debtors' products is available at https://www.hytera.us/products .

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

o *Analog Radios*. The Debtors' analog two-way handsets and vehicle fleets radios offer fewer applications than the Debtors' digital offerings at a lower price point.

11.    It is the Debtors' customary practice to enter into a standard agreement of master terms and conditions with each of its dealers (the "Dealer Contracts") annually which provides for pricing, minimum volume requirements and other terms. Orders are filled by Hytera East or Hytera West, as applicable, as they are placed by the Dealers pursuant to the Dealer Contracts. Certain of the Dealers place orders for new product as needed to perform end-user contracts. Other Dealers keep inventory of the Debtors' products on-hand both to perform existing contracts and to satisfy anticipated future customer demand.

12.    In order to most efficiently handle logistics and serve their Dealers and end-users, Hytera East and Hytera West each stores and ships inventory ("Inventory") from its own separate warehouse facility. In addition, each of Hytera East and Hytera West retains its own independent team of sales, finance/accounting and logistics personnel. The Inventory is largely acquired and imported directly from third-party affiliates overseas and to a minor degree from unaffiliated third parties.

13.    The Debtors formerly had warehouse, service, and research facilities in Shaumberg, Illinois (the "Schaumberg, Illinois Premises"). The Debtors' lease agreement for the Schaumberg, Illinois Premises expired by its terms on March 31, 2020, and the Debtors have vacated the premises.

### 2.  HYT North America

14.    As discussed above, HYT North America owns the equity in Hytera East and Hytera West. It does not directly conduct any active business. Alla Ni Huang is the sole officer/director of HYT North America. The company does not have any employees or have any separate operations or income.

5

DOCS_LA:328465.9 38393/001

### 3.    Hytera East's Dominican Republic Operations

15.    Since 2015, Hytera East has maintained local business operations in the Dominican Republic that presently has several active projects, including Policia Nacional, 90 Sites and Terminal Projects. It currently has approximately $2.1 million of accounts receivable.

16.    Additionally, as set forth on Exhibit B, Hytera East owns 99.9% of the equity of non-debtor Hytera Dominicana SRL ("Hytera Dominicana") and 50% of the equity of non-debtor Consorcio Hytera A24 ("A24").

17.    Hytera Dominicana was founded in 2015.  Former employee of Hytera East, Andrew Ye Yuan, owns 0.1% of Hytera Dominicana. Hytera Dominicana does not have any business activities, has never entered into any contracts and does not have a bank account.

18.    A24 is a joint venture founded by Hytera East and a local company named Alarm Controls Seguridad, S.A. in 2016.  A24 has completed its performance under its project and it has an outstanding receivable in the amount of $467,774.27 under the project.

19.    All the payments of the above-mentioned projects are in local currency DOP.  The amount of USD is calculated based on the latest exchange rate: 1 USD = 55.52 DOP.

### SECTION II

### THE DEBTORS' ASSETS AND DEBTS

### A.    The Debtors' Assets

20.    In addition to the Inventory described above, the Debtors also have the following assets:

- Cash: As of the Petition Date, the Debtors have unrestricted cash of approximately $1.26 million (East) and $1.64 million (West).
- Furniture, Fixtures & Equipment and Other Personal Property: The Debtors own miscellaneous office equipment, furniture and computers.
- Accounts Receivable: As of the Petition Date, the Debtors estimate that they have accounts receivable owed by third parties totaling $16.9 million (Hytera East) and $5 million (Hytera West).

6

DOCS_LA:328465.9 38393/001

**B. Hytera America's Debts**

28.    Intercompany Obligations.  Hytera West and Hytera East engage in intercompany transactions from time to time for inventory and services.  As of the Petition Date, Hytera West owes an intercompany payable to Hytera East on account of these transactions in the approximate amount of $6 million.

29.    Accounts Payable. As of the Petition Date, the Debtors owed approximately $1 million (Hytera East) and $100,000 (Hytera West) to utilities, employees, taxing authorities, third party vendors, insurance premiums and other service providers.

30.    Damages Awarded in Motorola Solutions, Inc. v. Hytera Communications Corporation, Ltd.: As is described in more detail below, a jury recently rendered a verdict against the Debtors and Hytera China in Case No. 1:17-CV-01973 in the U.S. District Court for the Northern District of Illinois (the "U.S. District Court Action") and awarded damages totaling $345.8 million in compensatory damages and $418.8 million in punitive damages, for a total of $764.6 million.  On March 5, 2020, the District Court entered final judgment (the "Motorola Judgment").  The Debtors intend to vigorously appeal the Motorola Judgment.

## SECTION III

## EVENTS LEADING TO THE BANKRUPTCY

31.    The Debtors are currently operating from headquarters in Miami and Los Angeles.

32.    In the three years leading up to this bankruptcy filing, the Debtors have been embroiled in costly and contentious legal disputes with competing electronics data communications and telecommunications equipment manufacturers Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. (collectively, "Motorola").  Among other allegations, Motorola has sued for trade secret misappropriation and copyright infringement of its DMR technologies, asserting substantial damages claims against Hytera China, Hytera East and Hytera West.  Specifically, Motorola contends that, in 2008, Hytera hired three Motorola engineers Gee Siong Kok ("G.S. Kok"), Samuel Chia, and Yih Tzye Kok ("Y.T. Kok."), and that those engineers downloaded and misappropriated over 7,000 technical, marketing, sales, and legal documents containing Motorola

7

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

trade secrets and copyrighted materials related to Motorola's DMR products. Motorola alleged that Hytera then relied on those alleged trade secrets and copyrighted materials to launch its DMR products in 2010 and continued to rely on them to develop and supply DMR products to the present.

33.    On March 14, 2017, Motorola filed trade secret misappropriation claims against Hytera in the U.S. District Court for the Northern District of Illinois under the Federal Defend Trade Secrets Act ("DTSA") and the Illinois Trade Secret Act ("ITSA"). On August 2, 2018, Motorola amended its complaint to include a copyright infringement claim under the U.S. Copyright Act.

34.    On May 31, 2017, Hytera moved to dismiss the complaint, contending among other things that Motorola's trade secret misappropriation claims were barred by the applicable statutes of limitations. The district court converted Hytera's motion to dismiss into a motion for summary judgment and allowed limited discovery. In its motion for summary judgement, Hytera argued that, at least as early as 2010, Motorola knew or should have known of the alleged misappropriation and that, at the latest, the statute of limitations expired in 2015, before Motorola brought its claims. The Court denied Hytera's motion. After the close of all discovery, Hytera filed another motion for summary judgment, but the issue was ultimately left to the jury.

35.    From November 6, 2019, to February 13, 2020, a 39-day jury trial was held on liability and damages for each of Motorola's claims. On February 14, 2020, the jury found Hytera liable for trade secret misappropriation and copyright infringement, and awarded monetary damages in the amounts that Motorola requested: $345,761,156 in compensatory damages and $418,800,000 in exemplary damages. The compensatory damages amount that Motorola requested was comprised of $136.3 million in disgorgement of Hytera's profits under the Copyright Act, $135.8 million in disgorgement of Hytera's profits under the DTSA, and $73.6 million in disgorgement of Hytera's alleged savings from avoided research and development costs under the DTSA. The Court entered final judgment on March 5, 2020.

36.    On February 18, 2020, Motorola filed an application for a temporary restraining order enjoining Hytera from, among other things, selling accused products worldwide. Hytera opposed Motorola's application for a temporary restraining order application on several grounds, including

8

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

that the Court lacks legal authority under the DTSA and Copyright Act to issue an injunction that applies extraterritorially. On March 4, 2020, the Court sought briefing on the appropriateness of a preliminary injunction bond. Motorola proposed a bond amount of $10,000. Hytera argued that a $10,000 bond would be insufficient and that a much higher bond would be needed because the disruption on Hytera's business would be significantly greater than $10,000. The Court has yet to rule on Motorola's application for a temporary restraining order or the appropriateness of a bond.

37. If granted, Motorola's proposed TRO would have a negative impact on the Debtors' operations because it would impact the products that the Debtors can sell.

38. On April 2, 2020, Hytera filed Motions for Judgment as a Matter of Law under Fed. R. Civ. P. 50(b) for a New Trial and/or Remittitur under Fed. R. Civ. P. 59. Hytera requests dismissal of, or a new trial on, Motorola's trade secret claims on the basis that the claims failed to satisfy the elements of a trade secret claim and are, in any case, barred on statute of limitations grounds. Hytera also requests dismissal of, or a new trial on, Motorola's copyright claims, on the basis that Motorola failed to prove substantial similarity between their copyrighted works and Hytera's accused works, that the Court erroneously allowed Motorola to assert late-added copyright registrations at trial, and that the copyright damages requested by Motorola are barred in any case by statute of limitations. Hytera additionally requests that the punitive damage award be set aside or reduced and that the court order a new trial or remittitur on the basis that the jury's damages award was excessive. Finally, Hytera asserts that a new trial is warranted because, among other reasons, evidentiary errors and erroneous and prejudicial jury instructions denied Hytera a fair trial.

39. The parties were engaged in limited settlement discussions and alternative dispute resolution in the course of the litigation, but such efforts were largely unproductive.

40. Motorola's action in the U.S. District Court for the Northern District of Illinois is one of many actions between the parties:

    a. On March 14, 2017, Motorola filed a patent infringement action against Hytera in the U.S. District Court for the Northern District of Illinois.[2]

---

[2] *Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.*, No. 1:17-cv-01972 (N.D. Ill. Mar. 14, 2017).

9

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

b. On March 28, 2017, Motorola filed a patent infringement action against Hytera in the U.S. International Trade Commission.[3]

c. On October 26, 2017, Hytera filed three petitions for *inter partes* review of Motorola's patents at the U.S. Patent Trial and Appeal Board.[4]

d. On November 9, 2017, Hytera filed a petition for *inter partes* review of Motorola's patent at the U.S. Patent Trial and Appeal Board.[5]

e. On December 4, 2017, Hytera filed an antitrust action against Motorola in U.S. District Court in the District of New Jersey under the Sherman Antitrust Act and the Clayton Act.

f. On August 28, 2018, Motorola filed a petition for *inter partes* review of Hytera's patent at the U.S. Patent Trial and Appeal Board.[6]

g. On July 20, 2018, Motorola filed a petition for *inter partes* review of Hytera's patent at the U.S. Patent Trial and Appeal Board.[7]

41.    In March 2020, anticipating that their operations are not sustainable for the long-term, the Debtors commenced a marketing and solicitation process with the help of investment bankers Imperial Capital LLC ("Imperial"). In order to commence a comprehensive process, the Debtors and Imperial worked with management to develop marketing materials, financial forecasts, and a list of potentially interested parties to be contacted, and prepared for access to potential bidders to the Debtors' information. Imperial on behalf of the Debtors has now contacted more than ninety potentially interested parties, including both strategic and financial buyers, and has provided them a teaser document. Imperial has prepared additional documentation in support of the marketing effort and is prepared to move expeditiously to provide further information to potential bidders as the process moves forward.

---

[3] *In re Two-Way Radio Equipment and Systems, Related Software, and Components Thereof*, No. 337-TA-1053 (ITC Mar. 28, 2017).

[4] *Hytera Communications Corporation Ltd. Motorola Solutions, Inc.*, IPR2017-02179, IPR2017-02183, IPR2018-00128 (PTAB, Oct. 26, 2017).

[5] *Hytera Communications Corporation Ltd. Motorola Solutions, Inc.*, IPR2018-00176 (PTAB, Nov. 9, 2017).

[6] *Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.*, IPR2018-01621 (PTAB, Aug, 28, 2018).

[7] *Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.*, IPR2018-01433 (PTAB, July 20, 2018).

DOCS_LA:328465.9 38393/001

42.    The Debtors are hopeful that they will soon be able to identify a suitable stalking horse purchaser and commence a court supervised section 363 auction process for the sale of substantially all of the Debtors' assets. The Debtors believe that an open and transparent auction and sale process is the best way to maximize value for stakeholders.

**SECTION IV**

**FIRST DAY MOTIONS**

43.    The Debtors have filed a number of First Day Motions seeking orders that grant relief intended to stabilize the Debtors' operations and facilitate the efficient administration of the estates.

44.    I have reviewed each of the First Day Motions and believe that the relief requested therein is necessary to allow the Debtors to operate with minimal disruption at this critical time. A description of the relief requested and the facts supporting each of the First Day Motions is attached as **Exhibit A**.

[Remainder of page intentionally blank]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

11

DOCS_LA:328465.9 38393/001

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 25th day of May 2020 at Fairfax Station, VA.

_____
Ni Huang

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**Exhibit A[1]**
**Evidentiary Support for First Day Motions**

**MOTION OF DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY AND/OR HONOR PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION; (II) REMIT WITHHOLDING OBLIGATIONS; AND (III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS**
**("Employee Motion")**

1.        Pursuant to the Employee Motion, the Debtors seek an order authorizing the Debtors, in the ordinary course of business and in accordance with pre-petition practices to (i) pay and/or honor prepetition wages, salaries, employee benefits, and other employee compensation or reimbursements; (ii) remit withholding obligations; and (iii) maintain employee compensation and benefits programs and pay related administrative obligations.

2.        In connection with the normal operation of their business, the Debtors incur obligations for (a) employee wages and salaries (the "Wages"), (b) employee benefits and other compensation or reimbursements (the "Benefits" and, collectively, with the Wages, the "Wages and Benefits"), (c) withholding obligations ("Withholding Obligations"), (d) vacation and sick leave, and (e) other obligations related to the preservation of the Debtors' work force (collectively, the "Employee Obligations").

3.        The Debtors have nineteen (19) full-time employees at Hytera West of whom 16 are paid salaries and three (3) of whom are paid based on hours worked (the "Hytera West Employees") and twenty (20) full-time employees at Hytera East of whom seventeen (17) are paid salaries and three (3) of whom are paid based on hours worked (the "Hytera East Employees") (collectively the Hytera West Employees and Hytera East Employees are referred to as the "Employees").  One (1) of the salaried Employees is an insider (the "Insider Employee").

4.        The Employees' functions include sales, sales engineers, technical support, finance, logistics, human resources, in-house legal, and marketing, and are vital to the orderly administration of the Debtors' estates.  The Debtors do not have any independent contractors.  Payment of, and otherwise honoring, the Employee Obligations is necessary to maintain the Employees' morale

---

[1] If not defined in this **Exhibit A,** capitalized terms have the definition given to them in the applicable  motion.

1

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

through the administration of the Debtors' cases and to prevent many of the Employees from suffering extreme personal hardship or from leaving the Debtors during the pendency of these cases. I believe that the payment of such amounts by the Debtors is critical to the Debtors' ability to operate. Should the Employee Obligations not be met, I believe that there is a significant risk that the Employees would cease working with the Debtors, and the Debtors' operations would be irreparably damaged, to the detriment of all parties.

5.      The Debtors have been paying and/or honoring the Wages and Benefits in the ordinary course of business up to the Petition Date.  To the best of my knowledge, the Debtors will have sufficient funds available postpetition to pay or honor promptly all amounts related to the Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Consequently, there is no reason for the regular payment of Wages and Benefits to be disrupted, which disruption would directly harm the Debtors' Employees and their restructuring prospects, to the detriment of all parties in interest.

6.      Hytera East's biweekly gross payroll (including one Insider Employee) averages approximately $75,000, which figure includes wages and taxes paid by Hytera East on behalf of its Employees (including withholding taxes), and withholdings for various Employee benefits, which are described more fully below.  None of Hytera East's Employees are associated with a union. Additionally, Hytera East's operations in the Dominican Republic are supported by two local independent contractors (the "DR Contractors").  The DR Contractors are paid monthly in arrears in Dominican pesos, totaling approximately $1,500 USD per month.[2]

7.      Hytera East also administers the payroll for 5 (five) employees of non-debtor affiliate Norsat International, Inc. (the "Norsat Employees"), totaling approximately $26,000 bi-weekly, which amount is not included in the gross figure above.  The cost of these expenditures on account of the Norsat Employees are reimbursed to Hytera East.

8.      In the ordinary course of business, Hytera East's Employees are paid five days in arrears, every other Friday (each, an "Hytera East Payroll Date").   In the most recent payroll run,

---

[2] Based on a rate of exchange rate of 1 USD = 55.7491 DOP.

2

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

which was done on May 22, 2020, Hytera East's Employees were paid for the period May 3, 2020 through and including May 16, 2020.[3]  The next scheduled Hytera East Payroll Date is June 19, 2020 for the period of May 31, 2020-June 13, 2029.  As the next payroll run will be entirely for services performed postpetition, the Debtors do not believe that any prepetition Wages will be owing to Employees of Hytera East. However, as discussed above, the DR Contractors are paid monthly in arrears.  Due to the Debtors' mid-pay cycle filing, and in an abundance of caution, the Debtors seek authority to continue to pay Employees of Hytera East all Wages and the DR Contractors, including any accrued prepetition amounts, as they come due in the ordinary course of business.

9.    Hytera West's Employees are paid twice a month (*i.e.*, the 15th and the last day of every month) for the semi-monthly period ending on such pay date (each, an "Hytera West Payroll Date").  Hytera's West Employees were paid on May 15, 2020 for the period May 1-15, 2020. In addition, the Hytera West Payroll Date for the period of May 16-31, 2020 was paid on May 22, 2020. As the next payroll run will be for entirely for services performed postpetition, the Debtors do not believe that any prepetition Wages will be owing to Employees of Hytera West. In an abundance of caution, however, the Debtors seek authority to continue to pay Employees of Hytera West all Wages, including any accrued prepetition amounts, as they come due in the ordinary course of business.

10.    As noted above, the Debtors each utilize a payroll processing provider (Hytera East - ADP Total Source and Hytera West – ADP RUN), to process its payroll.  In each case, ADP Total Source or ADP RUN, as applicable, withdraws from the applicable Debtor's bank account the amounts to be paid to Employees and for taxes approximately two business days prior to each Hytera East Payroll Date and Hytera West Payroll Date.  As part of the relief requested hereunder, the Debtors seek authority to permit ADP Total Source and ADP RUN to continue to process the payroll of the Debtors' Employees in the ordinary course of business.  On a monthly basis, Hytera East pays ADP Total Source approximately $1,300 and Hytera West pays ADP RUN approximately $1,500 in

---

[3]. Due to the anticipated bankruptcy filing and uncertainty of obtaining a first day hearing timely in the midst of the Covid-19 pandemic, Hytera East's most recent payroll run included, in addition to regularly scheduled payroll, all amounts accruing prepetition that otherwise would have been paid on the next scheduled Hytera East Payroll Date of June 5, 2020.

3

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

fees to process payroll.  To the extent that any fees are outstanding to ADP Total Source and/or ADP RUN as of the Petition Date, the Debtors request authority to pay any amounts owing in the ordinary course.

11.    The Debtors will continue to make payments on account of Employee Wages for the postpetition period in the ordinary course of business following the Petition Date. As is set forth in the *Debtors' Emergency Motion for Order Authorizing (a) Maintenance of Existing Bank Accounts (b) Continuance of Existing Cash Management System, Bank Accounts, Checks and (c) Related Relief* (the "Cash Management Motion") filed concurrently herewith, I anticipate that the Employee payroll to be paid by the Debtors will be paid from their existing bank accounts, which the Debtors are seeking approval to maintain in accordance with the Cash Management Motion**.** To the best of my knowledge, the Debtors have or will have sufficient postpetition funding to pay promptly all Employee Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business.

12.    In the ordinary course of their business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third parties for purposes such as social security and Medicare, federal and state or local income taxes, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations").  Prior to the Petition Date, the Debtors' average Withholding Obligations, for their respective payroll periods, were approximately $14,400 (Hytera East) and $19,200 (Hytera West), including payroll tax obligations, payroll fees and garnishments.

13.    Certain of the Debtors' Employees incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Expenses incurred for travel, meals, entertainment, transportation and office supplies (the "Employee Incurred Business Expenses"), and incurred by the Employees and submitted by the Employees to the Debtors for reimbursement.

14.    On an average monthly basis, the Debtors have paid approximately $8,300 (Hytera East) and $6,000 (Hytera West) on account of the Employee Incurred Business Expenses.

4

DOCS_LA:328465.9 38393/001

15.     As of the Petition Date, I believe that the Debtors are current on their Employee Incurred Business Expenses.

16.     The Debtors provide premium-based health insurance to their Employees, including medical, vision, dental, life insurance and other health and wellness benefits (collectively, the "Health Plans"), as summarized below, as well as flexible spending accounts ("FSAs") and voluntary supplemental insurance (the "Voluntary Plans" and, together with the Health Plans, the FSAs and Voluntary Plans, the "Health and Wellness Plans").  For Hytera East, most of the cost of the Health Plans and Wellness Plans is collected by ADP Total Source each biweekly pay period through payroll, with the exception of life and disability insurance which is invoiced directly by the provider, Met Life, quarterly in advance.  For Hytera West, the administrators of the Health Plans, CaliforniaChoice (medical and vision), BlueCross (supplemental insurance) and Delta Dental (dental), invoice Hytera West in advance for the full amount of fixed premiums owing as of the first of each month for that month's coverage period, with the exception of life and disability insurance which is invoiced by the provider, Blue Cross Blue Shield, quarterly in advance.  As described in greater detail below, for the Health Plans, Employees make contributions towards the Health Plan premiums and the Debtors deduct the Employees' portion of the premiums owing under the Health Plans from their Wages every pay period.  The Debtors then provide the administrators of the Health Plans with the full payment of premiums, the cost of which is shared by the Debtors and the Employees.

17.     The Debtors provide their Employees with the following Health Plans:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

5

DOCS_LA:328465.9 38393/001

| | Medical | Dental | Vision | Life Insurance, LTD & STD |
|---|---|---|---|---|
| Hytera East | NHP United Health Care (HMO and PPO) | Guardian PPO | VSP | Met Life |
| Hytera West | United Healthcare (HMO); Kaiser (HSA/HMO); BlueCross (HMO, PPO, EPO/HAS); Health Net (HSP)[4] | Delta Dental PPO | VSP | Blue Cross Blue Shield |

18.     The Health Plans provide an inclusive package of general health, dental, vision and life insurance benefits.  On an average monthly basis, Hytera East and Hytera West remit approximately $17,500 and $17,000, respectively, in the aggregate to the administrators and providers of the Health Plans.  Of the total remitted by Hytera East, approximately $2,900 is Hytera East's Employees' share and of the total remitted by Hytera West, approximately $7,200 is Hytera West's Employees' share.[5]

19.     In addition to the Health Plans summarized above, both Debtors offer certain supplemental Voluntary Plan benefits, and Hytera East offers FSAs and FSA dependent care benefits to its Employees.  The average monthly cost of these benefits to each of the Debtors is less than $5,000 per month.

20.     As of the Petition Date, the Debtors are current on the payment of invoiced premiums and claims due and owing to the Health Plan, FSAs and Voluntary Plan providers and administrators.

21.     The Debtors provide ten (10) paid holidays for its Employees.  The Debtors also provide their Employees with regular paid time off ("PTO") to cover sick leave and vacation time.  Full-time Employees are entitled to accrue vacation at a rate of 3.33 hours per pay period capped at ten (10) days per year, which amounts may be carried over if not used in the year accrued, up to

---

[4] Offered through Hytera West's account with small business health insurance exchange, CaliforniaChoice.

[5] As noted above, the Norsat Employees are furnished benefits by Hytera East.  The cost amounts to approximately $5,000 per month, which amount is reimbursed to Hytera East.

6

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

maximum aggregate limit of fifteen (15) days (East) / twenty (20) days (West).  All Employees are also entitled to eighty (80) hours / five (5) days per year of paid sick leave.

22.     Approximately $100,500 in prepetition, unused vacation has been accrued by Employees of Hytera East and $68,100 in prepetition, unused vacation has been accrued by Employees of Hytera West.

23.     Under applicable states' laws, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors.  Hytera East obtains workers' compensation insurance through its insurer American International Group ("AIG").  Hytera West obtains workers' compensation insurance through Employers Assurance Co. ("EAC" and, together with AIG, the "WC Insurers").

24.     The Debtors are required to pay premiums to the WC Insurers (the "Workers' Compensation Obligations").  The Debtors pay premiums to its WC Insurers based on self-reported payroll.  Hytera East's estimated annual premium for the coverage year ending July 1, 2020 is approximately $11,900.  Hytera West's estimated annual premium for the coverage year ending July 8, 2020 is approximately $27,883.  At the end of each coverage year, amounts owing by the WC Insurers to the Debtors or vice versa are trued up and come due.  As of the Petition Date, the Debtors are current on monthly premiums.

25.     I believe that the continuance of the Debtors' policies with the WC Insurers Policy is appropriate in the ordinary course of business.

26.     The Debtors provide Employees with a 401(k) retirement plan (the "401(k) Plans").  The Debtors also match up to 4% of Employee contributions.  Employee contributions are withheld from paychecks as Withholding Obligations.  The Debtors' matching contributions are made to the 401(k) Plans in connection with each applicable payroll and are subsequently deposited to the participating Employees' respective 401(k) accounts.  The 401k Plans are audited annually by ADP, the fees for which are included as part of payroll processing fees.

DOCS_LA:328465.9 38393/001

27.    Payment of wages and benefits is critically necessary.  Due to the timing of the commencement of the Case, the Employees are owed accrued Wages and may also have incurred expenses that are covered under the Health Plans or Dental Plan for which payment is due postpetition.  I believe that the failure of the Debtors to pay the Employee Obligations timely in the ordinary course of business would result in a blow to Employee morale that in all likelihood would lead to turnover and other serious and irreparable disruptions of the Debtors' operations.

28.    I believe that the amounts to be paid pursuant to this Motion are comparatively small in comparison to the importance and necessity of preserving the Employees' services and morale and the difficulties and losses the Debtors will suffer if Employees' morale is low or if they leave in significant numbers.  I further believe that there is ample justification for their belief that even the slightest delay in providing this relief to its Employees will hamper operations and damage the Debtors' estates.

29.    I believe that the failure to transfer these withheld funds to pay Withholding Obligations could result in hardship to certain Employees.  I expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks.  Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

30.    Finally, the Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of the Case.  I believe that deterioration in the morale and welfare of the Employees at this critical time would adversely impact the Debtors and their ability to maximize the value of their assets.  I further believe that satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the Case and to ensure continued, efficient operation in order to maximize value for all creditors.

**MOTION OF DEBTORS FOR AN ORDER AUTHORIZING (A) MAINTENANCE OF EXISTING BANK ACCOUNTS, (B) CONTINUANCE OF EXISTING CASH MANAGEMENT SYSTEM,  BANK ACCOUNTS, CHECKS, AND (C) RELATED RELIEF ("Cash Management Motion")**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

8

DOCS_LA:328465.9 38393/001

1. Pursuant to the Cash Management Motion, the Debtors seek an order authorizing the (i) maintenance of existing Bank Accounts including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) continued use of the existing Cash Management System, Bank Accounts (defined below), and checks; and (iii) related relief.

2. In connection with the normal operation of their business, the Debtors maintain the bank accounts listed on Exhibit A attached to the Cash Management Motion (the "Bank Accounts"). The Bank Accounts are used by the Debtors for all receipts and disbursements from operations, as follows:

3. As of the Petition Date, the Debtors maintained eleven (11) Bank Accounts. Specifically, Debtor Hytera West maintains four (4) Bank Accounts at City National Bank ("CNB"). Two of these accounts (x7300 and x7319) are used for the collection of accounts receivable (either by way of regular check deposits or electronic wires) or to make disbursements to pay Hytera West's day-to-day operating expenses. In addition, Hytera West maintains two other Bank Accounts at CNB (x0581 and x5249) that are used to hold cash that secures the credit card programs administered by CNB and used by that Hytera West for its general operations. The former account (x5249) holds approximately $50,000 and the balance is maintained without any change. The latter account (x0581) currently has a balance of $0.00 because Hytera West no longer triggers the credit limits under one of its credit card programs that would require cash to collateralize its obligations thereunder.

4. Debtor Hytera East maintains three (3) Bank Accounts at Bank of America ("BofA"). One account (x3297) is used for incoming wires and ACH payments and the other (x6867) is a dormant account that has a small balance. The third account (x8880) is a zero balance account that Hytera East uses to make disbursements to pay for normal operation expenses.

5. Debtor Hytera East also maintains three (3) Bank Accounts at Banco de Reservas de la Republica Dominicana ("DR Bank" and, together with BofA and CNB, the "Banks"), consisting of one United States Dollar operating account (x7665), one Dominican Peso operating account (x4008), and one Dominican Peso certificate account (x0377) (collectively, the "DR Accounts").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

The funds in these Bank Accounts are used to pay local vendors in local currency and accept customer payments.  In general, the aggregate balance of the accounts at DR Bank is de minimis, and as of the Petition Date totaled approximately $30,000.

6.      Debtor HYT North America maintains one (1) Bank Account at BofA, which is used for general corporate purposes and has a minimal balance of approximately $3,000.00.

7.      The Debtors have accounting systems in place that enable them to track the movement of all cash into and out of the Bank Accounts, which will allow them to help ensure that no prepetition claim is paid after the Petition Date that is not authorized by the Court.

8.      It is my belief that requiring the Debtors to close the Bank Accounts immediately and to open new cash accounts as of the Petition Date will disrupt the Debtors' operations.  It will disrupt operations because depositors will not respond quickly to the change and will likely continue to send deposits to the original deposit accounts.

9.      Given the above, there is no benefit to closing the Bank Accounts and opening new cash deposit accounts plus it will only require the Debtors to expend resources that could otherwise be used to maintain operations while they transition info chapter 11.

10.      I anticipate that the Debtors will re-issue any outstanding prepetition checks from the Bank Accounts on account of prepetition obligations that the Debtors are authorized by the Court to pay pursuant to their first day motions

11.      As noted above, the Hytera East maintains three (3) Bank Accounts at the DR Bank, which is not federally insured.  However, the funds in the DR Accounts are de minimis and used solely to pay local vendors or receive payments from customers.  If the bond requirements set forth in section 345(b) of the Bankruptcy Code are not waived, the Debtors could be required to ask a foreign bank to post securities or bonds secured by the undertaking of a corporate surety – which I believe could prove impossible.  Even if such bonds are available, it is my believe that they are likely prohibitively expensive and a waste of the estates' resources.  Moreover, I believe that any such request may damage the Company's relationship with the DR Bank.

10

12.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors have and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (a) Bank services (the "Service Charges"), (b) checks deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable amount, and (c) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements").

13.     As with the Cash Management System, I believe that payment of the Cash Management Claims will minimize disruption to the Debtors' operations and is therefore in the best interests of the estates. Absent payment of the Cash Management Claims, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Cash Management Claims or freeze the Bank Accounts, and the Banks may refuse to provide services to the Debtors. The payment of Cash Management Claims will not prejudice unsecured creditors given that, as noted above, the Banks may have setoff rights with respect to the Cash Management Claims.

**MOTION OF DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(A)AND 366: (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE, (II) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT ("Utilities Motion")**

1.     Pursuant to the Utilities Motion, the Debtors seek an order: (i) prohibiting the utility providers utilized by the Debtors (collectively, the "Utility Companies" and each individually a "Utility Company") from altering, refusing, or discontinuing service to the Debtor without further order of the Court, (ii) determining adequate assurance of payment for future utility services, and (iii) establishing procedures for determining adequate assurance of payment.

2.     The Debtors receive essential utility services from the Utility Companies. A list of the Utility Companies and associated account numbers is attached to the Utilities Motion as Exhibit A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

11

DOCS_LA:328465.9 38393/001

3.      It is my belief that, at this critical time, uninterrupted water, electricity, gas, trash, sewer, local and long distance telephone services, cable, and internet services are essential to the ongoing operations of the Debtors' business and to the preservation of the value thereof.  Any interruption, however brief, in utility services to the Debtors will disrupt the Debtors' operations.

4.      The Debtors routinely pay their regular monthly utility obligations when due. However, the commencement of these chapter 11 cases occurred during the middle of the billing cycles for many, if not all, of the Utility Companies.  As a result, there are likely outstanding prepetition amounts owed to the Utility Companies.  To the best of my knowledge, the Debtors have and will have adequate cash to meet all of their necessary postpetition operating expenses on a current basis, including payments to the Utility Companies and the payment of the Utility Deposits (as defined below).

5.      The Debtors propose to allocate to each Utility Company adequate assurance of payment for their postpetition services in the form of segregated cash deposits (the "Utility Deposits" and each, a "Utility Deposit") as listed on Exhibit A to the Utilities Motion.  The Utility Deposit will equal approximately one month of the Debtors' estimated average postpetition monthly cost of prepetition services provided to the Debtors by such Utility Company.  The average monthly invoice amount was determined by averaging the amounts of the twelve most recently received monthly bills from each Utility Company.

6.      It is my belief that continued and uninterrupted utility service is critical to the Debtors' reorganization because the Debtors' facilities require utility services to operate the business and generate income.  If any of the Utility Companies alter, refuse, or disconnect service, even for a brief period, the Debtors' business operations would be shut down and their revenues would be cut off, severely disrupting the Debtors' cash flow, to the detriment of all parties.

**MOTION FOR AUTHORITY TO PAY IN THE ORDINARY COURSE OF BUSINESS PREPETITION CLAIMS RELATED TO SHIPPING AND WAREHOUSING CHARGES AND RELATED RELIEF
("Shipping and Warehousing Charges Motion")**

1.      Pursuant to the Shipping and Warehousing Charges Motion, the Debtors seek an order authorizing, but not directing, the Debtors to pay the prepetition claims of shippers,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

12

DOCS_LA:328465.9 38393/001

warehousemen, customs brokers, and other transportation lien claimants that have or are capable of asserting possessory liens against the Debtors' goods.

2.      The inbound and outbound shipment of the Debtors' products is entirely dependent on the services provided by various shipping companies, including United Parcel Services, Federal Express, DLS Worldwide, Expeditors International, DHL Express, and Brunel Air Cargo (collectively, the "Shippers").  The Shippers are responsible for the outbound shipment and transportation of goods from the Debtors' warehouses to their dealers and end-customers, as well as for the inbound transportation of finished products from China ("Inventory").  Amounts owed to entities used in the shipping process, such as fees charged by freight forwarders, common carriers, and customs duties, are all handled by the Shippers pursuant to their arrangements with the Debtors. Thus, the Shippers are responsible for and oversee the entire shipping and delivery process of the Debtors' products and materials from start to finish.

3.      The majority of the Inventory is stored at the Debtors' leased facilities in Miramar, Florida and Irvine, California (together, the "Warehouses").  Inventory is stored in the Warehouses and ultimately picked up by the Shippers and delivered to dealers and end-customers by the Shippers.

4.      As discussed above, the Debtors primarily use United Parcel Services, Federal Express, DLS Worldwide, Expeditors International, DHL Express, and Brunel Air Cargo to both (a) import Inventory from China and transport it to the Warehouses and (b) transport the Inventory from the Warehouses to dealers and end-customers.  The use of a particular Shipper is often dependent on the particular shipping need.  For example, DHL is often the most suitable choice for shipment of products to specified destinations in which it operates.  United Parcel Service is optimally equipped to handle large cargo shipments, whereas Federal Express is generally the most expedient choice when it comes to shipping smaller product packages.

5.      In addition, Hytera East is dependent upon the services of Blue Courier Express in the Dominican Republic, where the Debtors do not have any warehouses and require Blue Courier

13

Express to transport goods directly to customers and/or provide temporary warehousing for their products pending delivery to the project site.

6. The Debtors anticipate that the Shippers will demand immediate payment from the Debtors. It is my belief that, even absent a valid lien, the Shippers' mere possession (and retention) of the Debtors' merchandise and component parts would severely disrupt the Debtors' operations and restructuring efforts.

7. The estimated retail value of the merchandise being transported and/or processed as of the Petition Date by the Shippers is approximately $500,000 and substantially outweighs the outstanding shipping charges. It is my belief that, in the event that such charges remain unpaid, the Shippers likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are paid and their liens satisfied.

8. I believe that the total proposed amount to be paid to the Shippers is justified and reasonable compared to the importance and necessity of the Shippers releasing the merchandise worth $500,000 dollars and delivery of same and the losses the Debtors may suffer if their operations and the administration of their estates are disrupted. Moreover, I do not believe that there are viable timely alternatives to replace the Shippers that are to be paid pursuant to this Motion. Thus, it is my belief that nonpayment of the shipping charges will likely negatively impact the Debtors' ability to ship goods postpetition and, in turn, diminish the going-concern value of their business.

**MOTION PURSUANT TO  SECTIONS 105, 363, 1107, AND 1108 OF
THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING DEBTORS
TO MAINTAIN AND ADMINSTER DEALER INCENTIVE PROGRAMS,
HONOR PREPETITION OBLIGATIONS TO THEIR DEALERS,
AND RELATED RELIEF
("Customer Programs Motion")**

1. Pursuant to the Customer Programs Motion, the Debtors seek an order authorizing, but not obligating, the Debtors, in their sole discretion, to maintain and administer the Dealer Programs (defined below) and honor their prepetition obligations to their Dealers in the ordinary course of business and in a manner consistent with past practice.

14

DOCS_LA:328465.9 38393/001

2.      Prior to the Petition Date, in connection with the normal operation of their business and standard industry practice, the Debtors maintained certain incentive programs for their network of dealers that sell and distribute their products throughout the United States.  I believe that it is essential to the Debtors' operations that it be authorized to continue to honor these prepetition programs after the Petition Date as they come due in the ordinary course of business.  If they cannot maintain these programs, the Debtors risk damaging their carefully cultivated Dealer relationships, which may jeopardize their ability to maximize the value of their assets.

3.      Before the Petition Date, in the ordinary course of business, consistent with common practice in its industry, the Debtors offered the Dealer Programs described below, which consist of warranty programs, dealer rebates, dealer incentives, and dealer marketing allowances.  The Dealer Programs are a cornerstone of the Debtors' businesses and have been implemented to ensure Dealer satisfaction, meet competitive pressures, and protect the Debtors' reputation in the marketplace, thereby fulfilling expectations of current Dealers and ultimately enhancing net revenue.  For the reasons set forth below and in the Customer Programs Motion, I believe that it is in the best interests of the Debtors, their estates, and creditors, to be able to honor, in their sole discretion, the prepetition obligations in connection with the Dealer Programs, and to continue such Dealer Programs in the ordinary course of business.

4.      The Debtors generally warrant that all new products are free from defects in material and workmanship under normal use and service for a period of time from the date of purchase, subject to the terms and conditions outlined more fully in the limited warranty on all devices that were purchased new and from an authorized dealer (the "Warranty Program").  The Debtors' limited warranty provides that the Debtors will repair or replace materials subject to the warranty within one (1) to three (3) years of the original date of purchase, depending on the type of product (e.g., DMR radios have a 3-year warranty while analog radios have a 2-year warranty.  On average, less than 5% of the devices sold require repair or replacement under the warranty program.

5.      The Debtors have an industry standard rebate program for its network of Dealers (the "Dealer Rebate Program").  In general, the Debtors provide Dealers with a rebate based on the

15

DOCS_LA:328465.9 38393/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

purchase price of a transaction. The rebates range from 1% to 6% of the purchase price. The rebates are issued annually, after the close of the calendar year. As of the Petition Date, the Debtors estimate that they owe approximately $200,000 in rebates for the 2019 year.

6. The Debtors generally sell their devices to Dealers who then retail the devices to end-user customers. As a means of incentivizing individual Dealer sales representatives, the Debtors pay Dealer sales representatives a percentage of each unit sold (the "Dealer Incentive Program"). This incentive program is limited to a certain subset of Dealers that are critical to the Debtors. Under the incentive program, the Debtors pay individual Dealer sales representatives directly on a monthly basis. As of the Petition Date, the Debtors estimate that they owe eligible Dealer sales representatives approximately $22,000 on account of accrued prepetition sales commissions. On average, the Debtors pay approximately $6,000 in the aggregate to Dealer sales representatives.

7. The Debtors also provide funds to its Dealers for advertising and marketing (the "Dealer Marketing Program" and, collectively with the Dealer Incentive Program, Dealer Rebate Program, and Warranty Program, the "Dealer Programs"). Under this program, Dealers receive an advertising and marketing allowance of 2% of their total annual sales. However, Dealers may only apply their allowance toward 50% of any approved advertising and marketing expenses. All advertising and marketing allowances earned in a calendar year must be used on or before June 30 of the following year (*i.e.*, the advertising and marketing allowances for 2019 expire on June 30, 2020). Upon approval, the Debtors apply a credit on a Dealer's account in the amount of the approved advertising or marketing expense. For the avoidance of doubt, the Debtors do not pay the advertising and marketing allowance in cash. As of the Petition Date, the Debtors estimate the total advertising and marketing allowance to be approximately $500,000 for 2019, which expires on June 30, 2020.

8. I believe that the Dealer Programs are not only within the ordinary course of business, but indeed expected and relied upon by the Debtors and their Dealers and are customary for the industry in which the Debtors operate. It is my further belief that the value of the Company is dependent upon its relationship with its Dealers – and their motivation to promote and advertise the

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

Company's products.  The Company's failure to honor outstanding obligations owing under the Dealer Programs will severely and irreparably impair the Company's relationship with this critical constituency.

9.      The Debtors' primary source of revenue is its Dealer relationships.  Any failure to honor the Dealer Programs will severely strain the Debtors' credibility with its Dealers and the value of its business.

**EMERGENCY MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING HYTERA AMERICA INCORPORATED TO ASSUME THE AMENDED AND RESTATED INDEPENDENT DIRECTOR SERVICE AGREEEMENT**

**("Independent Director Service Agreement Assumption Motion")**

1.      Pursuant to the Independent Director Service Agreement Assumption Motion, the Debtors seek entry of an order authorizing them to assume that certain *Amended and Restated Independent Director Service Agreement* dated as of May 26, 2020 (the "IDSA") by and among Hytera East and Craig A. Barbarosh ("Independent Director").

2.      As discussed above, Hytera East is a wholly owned subsidiary of holding company HYT North America, which in turn is wholly owned by non-debtor Hytera China, a public company listed on the Shenzhen Stock Exchange.  On May 14, 2020, the Independent Director was appointed to the boards of directors of Hytera East and debtor Hytera Communications America (West), Inc. ("Hytera West" and, together with Hytera East, "Hytera OpCos").  Until the appointment of the Independent Director on May 14, 2020, Alla Ni Huang was the sole officer and director of the Hytera OpCos.

3.      At the time of the appointment of the Independent Director, the expectation of the parties was that at all times during the Independent Director's service as a director of each of the Hytera OpCos, each such company would have and maintain in force (at its sole expense) appropriate directors and officers liability insurance (collectively, the "D&O Policy") that provides, among other things, that the Independent Director is an "Insured Person" under such D&O Policy. However, on May 25, 2020, the Independent Director learned that Hytera West did not have a D&O

17

Policy in place and promptly resigned from the board of directors of Hytera West. Hytera West is working diligently to obtain a D&O Policy that will facilitate the re-appointment of the Independent Director to the board of directors of Hytera West.

4.      The Debtors commenced these chapter 11 cases as a "free fall" without a stalking horse bidder while the Debtors embark on a fulsome sale process. In addition, there is a possibility that an affiliate of the Debtors or an affiliate of Hytera China will submit a bid for substantially all of the Debtors' assets. Accordingly, it is my belief that it is important for the Independent Director to serve on its board of directors and oversee its sale efforts as the sole member of the board's restructuring committee. Moreover, under the circumstances, it is my belief that the retention of the Independent Director is a reasonable exercise of its business judgment and is in the best interests of its estates, creditors, and other parties in interest.

5.      I believe that the Independent Director is ideally suited to serve as a director of Hytera East and oversee its sale efforts. The Independent Director is a partner at a respected law firm with nearly 30 years of experience counseling clients in complex chapter 11 cases and serves on the board of directors for several public companies, including NextGen Healthcare, Sabra Health Care REIT, Inc., and Landec Corporation.

6.      To the best of my knowledge, the Independent Director has no relations to the Debtors or their creditors, other than as set forth in the Independent Director Service Agreement Assumption Motion. Given his qualifications and tremendous practical experience, Hytera East has selected the Independent Director to oversee its sale efforts and serve on its board of directors.

7.      Here, the terms of the IDSA represent a benefit to Hytera East's estate and its creditors, as it solidifies the appointment of an independent fiduciary to oversee its sale efforts, as is appropriate and prudent under the circumstances of these chapter 11 cases. As discussed above, the Debtors commenced these chapter 11 cases as a "free fall" without a stalking horse bidder and prior to embarking on a fulsome sale process. In addition, there is a possibility that the Debtors' parent company, Hytera China, will submit a bid for substantially all of the Debtors' assets. Accordingly, it is critical that Hytera East have an experienced independent director with bankruptcy and corporate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

18

DOCS_LA:328465.9 38393/001

governance experience at the helm to guide Hytera East through its chapter 11 case and the sale process.

8.      Moreover, upon information and belief, the Independent Director would resign immediately if the IDSA is not promptly assumed, potentially leaving Hytera East without an independent fiduciary.  Accordingly, it is my belief that assumption of the IDSA is in the reasonable business judgment of Hytera East and is essential to its sale efforts and its chapter 11 case to assume and honor the IDSA.

## DEBTORS' MOTION (A) APPROVING THE DEBTORS FILING A CONSOLIDATED LIST OF THIRTY LARGEST GENERAL UNSECURED CREDITORS FOR ALL CASES; AND (B) APPROVING THE DEBTORS FILING A CONSOLIDATED MASTER MAILING MATRIX FOR ALL CASES

### ("Consolidated Largest Creditor/Master Mailing List Motion")

1.      Pursuant to the Consolidated Largest Creditor/Master Mailing List Motion, the Debtors seek entry of an order approving each Debtor having filed in its respective case:  a consolidated list of the thirty largest general unsecured creditors for all Debtors; and a consolidated master mailing matrix ("Master Mailing Matrix") for all Debtors.

2.      As of the Petition Date, the Debtors estimate that they have over $750 million in liabilities and they have nearly 2,000 potential creditors and parties in interest (on a consolidated basis) in these chapter 11 cases.  Many of the Debtors' creditors overlap.  As such, I believe that requiring the Debtors to prepare individual Top 20 List of Creditors and individual mailing Matrixes for each Debtor would be a burdensome task and would greatly increase the risk and recurrence of error of information already on computer systems by the Debtors.

## FIRST OMNIBUS MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) REJECT EXECUTORY CONTRACTS, (B) REJECT NON-RESIDENTIAL REAL PROPERTY LEASES, AND (C) ABANDON ANY PERSONAL PROPERTY LOCATED AT SUCH PREMISES, AND (II) FIXING A BAR DATE FOR CLAIMS OF COUNTERPARTIES

19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**("First Omnibus Contract/Lease Rejection Motion")**

1.      Pursuant to the First Omnibus Contract/Lease Rejection Motion, the Debtors seek entry of an order (i) rejecting certain executory contracts identified on Exhibit 1 annexed to the proposed order (collectively, the "Rejected Contracts"), (ii) rejecting the lease of non-residential real property located in Schaumburg, Illinois (the "Leased Premises"), identified on Exhibit 2 annexed to the proposed order (the "Rejected Lease"), (iii) authorizing the Debtors to abandon any personal property located at the Leased Premises, and (iv) fixing a bar date for claims, if any, of the counterparties to the Rejected Contracts and Rejected Lease (the "Counterparties").

2.      The Rejected Contracts consist of certain vendor agreements identified in Exhibit 1 annexed to the proposed order, and include a vendor agreement related to the Leased Premises and a website design agreement.

3.      In conjunction with the Debtors' operational restructuring and proposed sale, the Debtors have determined that they have no further use for the Leased Premises.  Therefore, the Debtors, in the exercise of their business judgment, have determined to reject the Rejected Lease for the Leased Premises, which is for office and warehouse space at 1916 Wright Boulevard, Schaumburg, Illinois 60193.  The Debtors terminated and surrendered this lease prior to the Petition Date, but seek to reject the lease as of the Petition Date out of an abundance of caution.

4.      The Debtors seek to reject the Rejected Contracts and Rejected Lease, in accordance with principles of sound business judgment, based on the belief that the Rejected Contracts and Rejected Lease will be a burden to the Debtors' estates.  I do not believe that the Debtors have any further use for the Leased Premises as of the Petition Date, and the Rejected Lease no longer provide any economic benefit to the Debtors in connection with their operations.  Likewise, the Debtors have no further use for the services contemplated by the Rejected Contracts.

5.      Additionally, I believe that there is no net benefit that can be realized from an attempt to market and assign the Rejected Lease for several reasons, including because, to the extent the lease has not been terminated (which the Debtors maintain it has been), the lease is at or above-market rent.  As a result, I believe that the cost of performing their obligations under the Rejected

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

20

Leases and incurring unnecessary administrative expenses will exceed any realistic sales price. Thus, it is my belief that rejection of the Rejected Leases is in the best interests of the Debtors' estates and creditors, and other parties in interest.

6.     I believe that the costs associated with liquidating any personal property assets remaining at the Leased Premises on the Petition Date will likely approach or exceed the value of such assets.  Accordingly, it is my belief that the personal property at the Leased Premises, if any, has inconsequential value to the estates and should be abandoned as of the Petition Date.

## MOTION OF DEBTORS FOR AN ORDER EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS

### ("Schedules and SOFAs Deadline Extension Motion")

1.     Pursuant to the Schedules and SOFAs Deadline Extension Motion, the Debtors seek entry of an order extending by twenty-eight (28) days the deadline to file their Schedules of  Assets and Liabilities (the "Schedules") and their Statement of Financial Affairs (the "SOFA") (collectively, the "Schedules"), which are currently due on June 9, 2020.  If the Court grants the Motion, the Debtors' Schedules will be due on July 7, 2020.

2.     The Debtors have a small administrative office staff and due to the demands on the Debtors created by (i) filing these cases and the financial difficulties giving rise thereto, (ii) the need to maintain continuity in the Debtors' business, (iii) the need to implement the relief granted pursuant to a number of "First Day Motions," (iv) the immediate need to comply with the filing requirements as set forth in the "*Guidelines for Fulfilling the Requirements of the United States Trustee,*" and (v) the delay accomplishing the foregoing and preparing the Schedules on account of the COVID-19 issues that are disrupting the Debtors' day-to-day operations, the Debtors will not be able to complete the Schedules within the fourteen-day statutory period.  As such, given the foregoing, I believe that the Debtors require additional time in order to compile the requisite information necessary to ensure that accurate and complete Schedules will be filed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

21

## DEBTORS' MOTION (I) LIMITING SCOPE OF NOTICE; AND (II) IMPLEMENTING OTHER CASE MANAGEMENT PROCEDURES

### ("Notice/Case Management Procedures Motion")

1.      Pursuant to the Notice/Case Management Procedures Motion, the Debtors seek entry of an order (i) authorizing it to limit notice with respect to Limited Notice Matters (as defined below), and (ii) establishing other case management procedures.

2.      I believe that, due to the large number of creditors and other parties in interest in these cases, it would be appropriate to limit notice of the matters as set forth herein.  Service of notice of all pleadings and other documents to all creditors would substantially delay the provision of notice in each particular instance, thereby hampering the conduct of Debtors' business and impeding the consummation of transactions, or the granting of other relief that may be advantageous to Debtors' estates and creditors.  Moreover, service of notice to all creditors with respect to such matters would substantially increase the cost of service to Debtors' estates.

3.      I believe that the Debtors' proposed noticing procedures will mitigate the administrative and economic burdens that would otherwise be imposed upon the Debtors' estates, the Court, and other parties in interest without diminishing creditors' opportunity to receive notice if they so desire.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

22

DOCS_LA:328465.9 38393/001

# **EXHIBIT B**

**Corporate Organization Chart**

DOCS_LA:329368.7



329855.1